FOR PUBLICATION

**FILED**

JAMES J. WALDRON, CLERK

July 8, 2010

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY:  s/ Margaret Cohen, DEPUTY

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-2(c)**

| | |
|---|---|
| In re: | Case No.:      09-11482 MS |
| PERMALIFE PRODUCTS, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |
| PERMALIFE PRODUCTS, LLC; NEW YORK RUBBER RECYCLING, LLC; BRISTOW RUBBER RECYCLING, LLC; and ARIZONA RUBBER RECYCLING, LLC, | |
| Plaintiffs, | Adv. Pro. No.  10-1079 MS |
| v. | |
| TSJ DIRT, LLC; JERRY MORRISON; TIM WILLIAMS; DON C. FLETCHER, ESQ.; LAKE & COBB PLC; JIM P. MA; BULLDOG MARKETING, LLC d/b/a BULLDOG RUBBER AND RECYCLING; DAVID WILLIS; and IDM, LLC, | |
| Defendants. | |

**OPINION**

**APPEARANCES:**

**RABINOWITZ, LUBETKIN & TULLY, LLC**
Jay L. Lubetkin, Esq.
Laura E. Quinn, Esq.
293 Eisenhower Parkway
Livingston, NJ 07039
*Attorneys for Debtors/Debtors-in-Possession/Plaintiffs*

**WASSERMAN, JURISTA & STOLTZ, P.C.**
Steven Z. Jurista, Esq.
225 Millburn Avenue
P.O. Box 1029
Millburn, NJ 07041
 *- and -*
**TIFFANY & BUSCO, P.A.**
Christopher R. Kaup, Esq.
J. Daryl Dorsey, Esq.
2525 East Camelback Road
Phoenix, AZ 85016
*Attorneys for TSJ Dirt, LLC; Jerry Morrison, and Tim Williams*

**ARTHUR LINDERMAN, ESQ.**
190 Main Street, Ste. 304
Hackensack, NJ 07601
*Attorney for Lake & Cobb, PLC and Don C. Fletcher*

**LAKE & COBB, PLC**
Joel Sannes, Esq.
Don C. Fletcher, Esq.
1095 West Rio Salado Parkway, Ste. 206
Phoenix, AZ 85281
*Attorneys for Don C. Fletcher and Lake & Cobb, PLC*

**HONORABLE MORRIS STERN, U.S.B.J.**


I.    INTRODUCTION.

Chapter 11 debtor-plaintiff PermaLife Products, LLC ("PermaLife") and its codebtors[1]

complain in this adversary proceeding of postpetition stay violations, i.e., acts first to obtain

possession of certain equipment said to be property of the estate, and then participation in an

---

[1]Codebtors in these cases, filed January 23, 2009, include related entities New York
Rubber Recycling, LLC, Bristow Rubber Recycling, LLC and Arizona Rubber Recycling, LLC.
An Order for joint administration was entered on January 28, 2009.  No trustee has been
appointed; an unsecured creditors' committee was appointed on February 23, 2009.

auction sale and prompt resale of the equipment.  Resale proceeds are said to dwarf the winning $5,000 auction bid.

The defendants include TSJ Dirt, LLC ("TSJ"), owner of a certain facility in Eloy, Arizona which housed the equipment in question.  TSJ, exercising a self-help remedy under Arizona landlord lien law, sold the equipment to satisfy a rent-default claim against a nondebtor lessee.  This nondebtor was subject to common ownership with the debtor, and PermaLife is said to have guaranteed the lease.  Other defendants include auction sale and resale facilitators and those in the chain of equipment acquirers.

Included in the array of proceeding issues is the state of knowledge of TSJ and other defendants of the debtors' bankruptcy and any debtor's ownership of the equipment at the time of the targeted acts.  However, the immediate question is one of venue.  A number of defendants have moved to *dismiss*, *citing* 28 U.S.C. § 1409(d).[2]  They submit that the debtors' proceeding does not qualify for venue in this district (where the Chapter 11 cases are ongoing) because their claim arises postpetition "from the operation of the business of the debtor" in the District of Arizona.  That district is said to be the proper proceeding situs.  The plaintiffs counter,

---

[2] 28 U.S.C. § 1409:

> (d) A trustee may commence a proceeding arising under title 11 or arising in or related to a case under title 11 based on a claim arising after the commencement of such case from the operation of the business of the debtor only in the district court for the district where a State or Federal court sits in which, under applicable nonbankruptcy venue provisions, an action on such claim may have been brought.

3

contending that their claim is a matter of bankruptcy administration and that they are to benefit

from the Chapter 11 case court venue permitted by 28 U.S.C. § 1409(a).[3]

## II.    THE ARIZONA RUBBER FIRE AND THE ELOY, ARIZONA LEASE.[4]

Arizona Rubber Recycling, LLC ("Arizona Rubber"), a codebtor with PermaLife based

on certain commonality of ownership and interests, suffered a disastrous fire at its Maricopa,

Arizona plant in September 2007.  At that time, certain rubber recycling equipment (owned by

one or another of the debtors) was at that site.  The immediate controversy pertains to a "CM

Shredder," a coloring line (consisting of various cement mixers and conveyors), a bagging line

and an Artisan Dual Drive 24 *x* 36 Cracker Mill (the "Cracker Mill").  The debtors value this

equipment (the "equipment") at $500,000 as of December 2009.[5]

---

[3]28 U.S.C. § 1409:
> (a) Except as otherwise provided in subsections (b) and (d), a
> proceeding arising under title 11 or arising in or related to a case
> under title 11 may be commenced in the district court in which such
> case is pending.

[4]Factual allegations of this Point II as well as the following Point III are this court's
summary of those of the applicable Complaint, i.e., the "Amended Complaint," hereinafter the
"Complaint."  For the limited purpose of determining venue, those allegations are deemed
established.  *See* Point VII*, infra*.

[5]The Cracker Mill was purchased for $275,000 and is subject to what is described as a
full-value security interest held by Key Equipment Finance Inc. ("KEFI").  KEFI, through
counsel, participated in a January 4, 2010 hearing on the debtors' motion to void the auction sale
(and for other relief).  *See* Point IV, *infra*.  Apparently, KEFI acquiesces to the debtors' efforts at
relief *sub judice*.  KEFI filed a motion in the main case (dkt. 185) on November 4, 2009 for stay
relief to exercise its rights to the equipment.  The motion reflects a November 27, 2006 Master
Security Agreement whereby KEFI financed PermaLife's acquisition of recycling equipment.  A
March 27, 2007 Collateral Schedule listed the Cracker Mill.  A May 18, 2007 Collateral
Schedule listed a "Granutech Model 80 Grizzly Shredder"; that item was said to be the "CM
Shredder" by KEFI's counsel, and that it "had an initial lease principle amount of $289,000."
*See* Tr. 10:5-9, 1/4/10.  KEFI's motion was accounted for by this court's Order of December 21,
2009 (main case dkt. 215) which, among other things, would have required the surrender of the
shredder; the motion regarding the Cracker Mill was adjourned (never heard due to ensuing

4

The chief operator of the debtors, Sergi, intended to restart rubber recycling operations in Arizona. To that end, he executed on behalf of "Eloy Rubber Recyclers" ("Eloy Rubber"), a lease with TSJ for TSJ's Eloy, Arizona facility. The lease was signed on November 21, 2008, and was said to have been guaranteed by PermaLife. Base monthly rent was $2,150.

In December 2008 the equipment was moved to and stored at Eloy.

TSJ through its principals, defendants Morrison and Williams, were said to have been instrumental in assisting Arizona Rubber to prepare the Eloy site for the relocation of Arizona Rubber's recycling operations (recommending a consulting engineer to modify the facility and helping to obtain town approvals). However, the debtors were not able to complete improvements (apparently based upon the prohibitive cost of obtaining the necessary water supply). Rubber recycling was thus not initiated by Eloy Rubber, Arizona Rubber, or any other debtor at the Eloy location.

On January 23, 2009 the debtors filed Chapter 11 petitions. By October 2009 Eloy Rubber had fallen behind in rent, owing $5,000 in overdue payments.

III.    THE BANKRUPTCY CASES AND THE EQUIPMENT SALE.

TSJ attorney-defendant Fletcher has apparently produced an October 16, 2009 rent default notice from his law firm, defendant Lake & Cobb, PLC ("L&C"), to Eloy Rubber; a November 10, 2009 letter advising that TSJ would pursue remedies; and a November 16, 2009 letter and Notice of Sale at Public Auction. It is said that a sale was conducted and that defendant Ma was notified by letter dated December 2, 2009 that he was the successful auction bidder at $5,000.

_____

events).

Sergi, said to be unaware of the auction sale, was negotiating for a sale of the Cracker Mill at the end of November. These negotiations were through the manufacturer on behalf of the ultimate would-be end-user defendant Bulldog Marketing, LLC ("Bulldog"). Bulldog was said to have needed this piece of equipment by year-end to maintain a certain California license. Bulldog, it is alleged, knew of PermaLife's ownership of the Cracker Mill and of its bankruptcy. The manufacturer submitted a written offer at more than $190,000, subject to inspection and a payment remittance to acknowledge both the secured party and "the United States Bankruptcy Trustee."

It is claimed that Sergi negotiated approval of the "short sale" with the secured party. It is also claimed that Morrison of TSJ was notified by the manufacturer's representative on December 3, 2009 that he would like to inspect the piece. Morrison responded with news of the auction sale. The representative is said to have expressed his understanding that PermaLife owned the piece and was in bankruptcy.

On December 4, 2009, it is said that there was an inspection and that Bulldog's president and Morrison were present. PermaLife's interest, claim and bankruptcy were said to have been discussed.

Ultimately, it is alleged that the manufacturer, having been told that it could not make the purchase, lost interest in facilitating the sale and on December 8, 2009 refunded to Bulldog a deposit it had taken. However, on that date Bulldog is said to have contacted Ma, through Morrison, about a sale of the Cracker Mill for $125,000 (and some more of the equipment for $8,000).

In the interim, beginning on December 7, 2009, debtors' counsel is said to have learned

of the auction sale events and called TSJ's Williams (leaving a voicemail).  Fletcher responded

likewise on December 9, 2009, and counsels' involvement continued with telephone

conversations and e-mail exchanges of December 10, 2009, a Rule 2004 subpoena issuing to

Fletcher on December 11, 2009 and stay violation allegations per e-mails of December 17, 2009.

It is pled that Bulldog consummated its purchase from Ma on December 21, 2009.

As with the Cracker Mill, it is alleged that Morrison of TSJ arranged in December 2009

for the resale by Ma of the CM Shredder (for $5,000 to defendant IDM, LLC).

IV.    <u>DEBTORS' MOTION TO VOID SALE, ETC.</u>[6]

On December 23, 2009 the debtors moved "to Declare Sale of Equipment a Violation of

the Automatic Stay and Void *Ab Initio* and for Sanctions."  The motion was heard by telephone

on January 4, 2010.  Fletcher, appearing for TSJ, said he was unaware of the location of the

equipment.  This court reserved decision as to whether the equipment was property of the estate,

but ordered from the bench that the *status quo* be maintained.  A written Order to that effect

followed on January 5, 2010.  The third decretal paragraph of that Order provided:

> The Equipment, whether currently located on the Property, or at
> another location, and whether in the possession of TSJ Dirt, LLC or
> in the possession of the purchaser, identified as Jim Ma, shall not be
> relocated, removed, disturbed, dismantled or tampered with in any
> fashion pending further Order of this Court.

---

[6]Facts set forth in this Point IV are derived from both this court's docket in the main case
and as per the Complaint.

Given the completion of the December resales, the effort to maintain the *status quo* by holding

the equipment in place at the TSJ facility or with the immediate transferee per the auction proved

to be futile.

V.      THE ADVERSARY PROCEEDING COMPLAINT.

        After reciting its factual allegations, the plaintiffs pled in four counts:

| | |
|---|---|
| First Count: | To Declare Sale of Equipment Violation of Automatic Stay and Void *Ab Initio* |
| Second Count: | To Declare Sale of Equipment a Willful Violation of the Automatic Stay |
| Third Count: | Punitive Damages |
| Fourth Count: | Contempt for Failure to Respond to Subpoena. |

        The First Count seeks a determination that the equipment is property of the debtors'

estate (per 11 U.S.C. § 541(a)), that the public auction sale violated the statutory stay of

11 U.S.C. § 362(a), that the sale is void *ab initio*, and that the equipment should be returned to

the debtors.  A willful stay violation determination is sought against TSJ, Morrison, Williams,

Bulldog, Willis, L&C and Fletcher in the Second Count.[7]

VI.     MOTIONS BASED UPON 28 U.S.C. § 1409(d).

        TSJ, Morrison and Williams have moved to dismiss per FED. R. BANKR. P. 7012(b)

(incorporating FED. R. CIV. P. 12(b)(3)) based upon 28 U.S.C. § 1409(d), while Fletcher and

L&C have likewise moved to dismiss or for a change of venue to the purportedly more

convenient District of Arizona pursuant to 28 U.S.C. § 1412.[8]  In support of their motion, TSJ,

---

        [7]The court has jurisdiction over this adversary proceeding pursuant to
28 U.S.C. § 1334(b); this matter is core under 28 U.S.C. § 157(b)(2)(A), (E) and (O).

        [8]28 U.S.C. § 1412:

                A district court may transfer a case or proceeding under title 11 to a
                district court for another district, in the interest of justice or for the

Morrison and Williams initially submitted a Williams Declaration ("Williams Decl."),  which

briefly set forth TSJ's Arizona locus and operations.  Knowledge of "TSJ" of both the

bankruptcy cases and the debtors' claim to the equipment *on the date of the "landlord's lien*

*sale"* were disclaimed.  Williams Decl. ¶¶ 10 and 11.  The inconvenience of venue in the District

of New Jersey was stressed.  Morrison's Declaration ("Morrison Decl.") was provided in Reply

and emphasized that the debtors' principal had told him that "all of the equipment moved by his

companies to TSJ Dirt's property was to be utilized to conduct their business in Arizona."

Morrison Decl. ¶ 6.  No additional sworn written statements were provided by Fletcher and

L&C; these movants rely upon the co-movants' Declarations.

> The plaintiffs' response was supported by a Certification of Sergi ("Sergi Certif.") which

mirrored much of the Complaint.  It emphasized that it was hoped that the TSJ site could be

utilized to operate a rubber recycling business but Sergi "realized prior to the Petition Date that

[he] would not be able" to so operate.  "Arizona Rubber never resumed operations after the fire

in September 2007."  "Since the Petition Date" Sergi intended "to liquidate the pieces of the

Equipment which could not be utilized by one of the joint debtors."  Sergi Certif. ¶¶ 4, 6 and 9.

VII.   FACT BASE FOR DETERMINING VENUE; BURDEN OF
       PROOF IN VENUE DISPUTES.

> "On a motion to dismiss, the court accepts the well-pleaded allegations of the complaint

as true."  *In re Britt Airways, Inc.*, 169 B.R. 533, 534 (Bankr. D. Del. 1994) (*citing In re Century*

*Glove*, 151 B.R. 327, 332 (Bankr. D. Del. 1993)).  This proposition is generally accepted where

---

convenience of the parties.

dismissal motions are based upon disputed venue.[9]  Indeed, "[f]indings of fact and conclusions of

law are unnecessary on decisions of motions under Rule 12 [which includes Rule 12(b)(3)

motions raising the defense of improper venue] . . . ."  FED. R. BANKR. P. 7052 (incorporating

FED. R. CIV. P. 52(a)).  *See Myers v. Am. Dental Ass'n*, 695 F.2d 716, 729 (3d Cir. 1982), *cert.*

*denied*, 462 U.S. 1106 (1983).

        Nevertheless, parties' affidavits (or the equivalents) are considered by courts in resolving

Rule 12(b)(3) venue motions.  *See, e.g., Heft v. AAI Corp.,* 355 F. Supp. 2d 757, 762 (M.D. Pa.

2005) (*citing Myers*, 695 F.2d at 724) ("[T]he parties may submit affidavits in support of their

positions, and may stipulate as to certain facts, but the plaintiff is entitled to rely on the

allegations of the complaint absent evidentiary challenge").  "[U]ncontroverted allegations in

. . . [plaintiff's] complaint must be taken as true, and conflicts between the facts contained in the

parties' affidavits must be resolved in . . . [plaintiff's] favor."  *Brayton Purcell, LLP v. Recordon*

*& Recordon*,  606 F.3d 1124, 1127 (9th Cir. 2010), *quoting Rio Props., Inc. v. Rio Int'l Interlink,*

284 F.3d 1007, 1019 (9th Cir. 2002).  To the same effect, see *Fellner ex. rel. Estate of Fellner v.*

*Phila. Toboggan Coasters, Inc.*, No. Civ. A.05-2052, 2005 WL 2660351, at *1 (E.D. Pa. Oct. 18,

2005) ("[The court] may examine facts outside the complaint to determine proper venue, but

must draw all reasonable inferences and resolve all factual conflicts in the plaintiff's favor").

*See also Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002) (acknowledging the

same standard as it would apply to disputed personal jurisdiction).

───────────────────

        [9]"Of course, for purposes of determining whether venue requirements were met, the
substantive allegations of [plaintiff's] claim . . . must be accepted as true."  *Leroy v. Great*
*Western United Corp.*, 443 U.S. 173, 189 (1979) (White, J. dissenting).

Similarly, in the Third Circuit the defendant bears the burden to demonstrate that venue is improper when that venue is contested. *Myers*, 695 F.2d at 724. *See Simon v. Ward*, 80 F. Supp. 2d 464, 466-68 (E.D. Pa. 2000) (reviewing the substantial dispute among treatises and courts on the burden of proof in venue contests, and acknowledging *Myers* as the law of this circuit). *See also ProMODEL Corp. v. Story,* Civ. No. 07-3735, 2007 WL 4124502, at *1 (E.D. Pa. Nov. 19, 2007).

Whether the § 1409(a) specialized trustee home-court "default" venue provision's footing in the need "for speedy and economic administration of the bankruptcy case"[10] is *further* justification for the twin precepts of treatment of factual allegations and burden of proof is arguable. The § 1409(d) *exception* to specialized home-court bankruptcy venue–i.e., for claims arising out of post-case commencement operations of the debtor's business–is a potential "brake" on the speed of the bankruptcy system. This reflects the concern of Congress for the unfairness that venue at a distance from the debtor's business operations could present in some instances. In this court's view, the § 1409(a) versus § 1409(d) tension and policy balance in disputed venue proceedings is appropriately reflected in the more general venue law of this circuit. That is, the trustee (or, as here, debtors-in-possession) as plaintiff may select the bankruptcy case venue for ease of administration, garnering the benefit of the aforedescribed preference as to facts pled and contested. Moreover, the burden of proving improper venue in proceedings such as these (i.e., where the defendant asserts that the plaintiff's claim is

_____

[10]*See In re B & L Oil Co.*, 834 F.2d 156, 159 n.8 (10th Cir. 1987) (quoting *In re Nixon Mach. Co.,* 27 B.R. 871, 873 (Bankr. E.D. Tenn. 1983) and citing other cases supporting this "paramount consideration").

11

postpetition debtor business operation based), should rest with the proponent of the § 1409(d) *exception* to the § 1409(a) more general rule of efficiency in administration.

In the case at bar, little (if any) conflict as to basic venue facts is reflected in the motion papers. The *ownership of the equipment* is not factually contested by the movants; thus, for purposes of determining venue, the debtors' contention that the equipment was owned by one or another of them must be taken as true. The equipment is, for motion purposes, deemed to be property of the estate per 11 U.S.C. § 541(a).

Sale and resale of the equipment are not factually contested. Asserted equipment values, the seeming bargain sale prices, and the resale prices are also not contested.

It is only where the Williams Declaration contests the "TSJ" knowledge of both a debtor's ownership of the equipment and the existence of the bankruptcy cases on the date of the auction sale that conflict develops. That Declaration is in opposition to allegations of the Complaint of the *willful violation* of the stay by virtue of the knowledge of TSJ, Williams and Morrison "prior to December 2009." *See* Complaint, Second Count ¶¶ 84 and 85.[11] The balance of this Second Count for compensatory and punitive damages for willful violation of the stay implicates certain defendants in purportedly violative conduct engaged in *after* the auction sale. The Third Count ("Punitive Damages") likewise *first* relates to acts of TSJ, Williams and

---

[11]

84.    TSJ, Williams and Morrison were aware of the Debtors' bankruptcy prior to December 2009.

85.    TSJ, Williams and Morrison intentionally sold the Equipment to Ma at a public auction with awareness of the Debtors' bankruptcies.

Morrison in conducting the auction sale,[12] *then* focuses on the resales.[13]  Hence, both the Second

and Third Counts have substantial elements of *uncontested* 11 U.S.C. § 362(a) stay violation

assertions of a *willful* nature.  Moreover, even an unwitting stay violation–wrongful but innocent

exercise of process over property of the estate–is subject to remedy.  *See, e.g., In re Wright*, 75

B.R. 414, 416 (M.D. Fla. 1987).  This is the essence of the Complaint's First Count, which

simply seeks return of the equipment to the debtors, a declaration that all sales complained of are

to be void *ab initio*, and that pre-auction sale status quo should be restored.  Again, violation

(though nonwillful) of the statutory stay as a function of the auction sale, deemed to be such

solely for purposes of admeasuring venue, is not a contested matter at this time.

In sum, there is no meaningful conflict regarding venue related facts.  The only issue for

present purposes is the question of whether the debtors' claim, developed postpetition, arises

"from the operation of the business of the debtor" or, to the contrary, whether it is intimately

bound up with matters of administration of these bankruptcy cases.

## VIII.   IS DEBTORS' CLAIM "FROM THE OPERATION OF THE BUSINESS OF" A DEBTOR,  OR, A MATTER OF BANKRUPTCY ADMINISTRATION?

As reflected in Point VII, *supra*, there is at least potential for inherent tension between

28 U.S.C. § 1409(a) and § 1409(d).  The general rule of § 1409(a) bankruptcy case venue for

---

[12]

> 100.   TSJ's, Williams' and Morrison's actions in conducting the Sale were egregious and performed in bad faith.

[13]Whether the following paragraph has elements of knowledge of equipment and debtor status prior to the auction sale, as well as after, is open to question:

> 103.   TSJ's, Williams' and Morrison's actions in refusing to remedy their stay violation and in exacerbating the harm to the Debtors were egregious and performed in bad faith.

proceedings is well-grounded in the centralization and administrative necessities of bankruptcy; the § 1409(d) carve out from the general rule, directing "trustee" initiated proceedings away from his/her home court, is fairness-based.[14]   And, it is well accepted that a debtor-in-possession, such as the plaintiffs here, shall have ascribed to it the rights and duties attributable to a "trustee" in § 1409.  *See* 11 U.S.C. § 1107(a); *In re Britt Airways, Inc.*, 169 B.R. at 535; *In re Cont'l Air Lines, Inc.*, 61 B.R. 758, 770 n.24 (S.D. Tex. 1986).

Section 1409 is derived from its near-identical predecessor, 28 U.S.C. § 1473.[15]   That section's 1978 legislative history reflects the fundamental consideration (unstated in the statutory text) of bankruptcy administration in favoring "home court" venue, as follows:

> [W]ith two exceptions, enumerated in subsections (b) and (d), the court in which the bankruptcy case is pending is always a proper venue for proceedings arising under title 11 or arising under or related to a case under title 11. Though these venue provisions are phrased in broad terms, with respect to *administrative matters* in a case they generally will not apply. The bankruptcy court in which the case is filed will hear *those* matters.

H.R. REP. No. 95-595 at 446 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6402 (emphasis added).  *See In re Britt Airways, Inc.,* 169 B.R. at 535 (quoting and relying upon same); *In re Eagle-Picher Indus., Inc.*, 162 B.R. 140, 142 (Bankr. S.D. Ohio 1993) (citing the same legislative history and concluding that "[a]lthough § 1409(d) is phrased broadly, it does not

---

[14]Other subsections of § 1409 likewise balance these sometimes competing interests (*see* § 1409(b) and (e), providing situs relief at (b) for *defendants* against whom a trustee would seek relatively low dollar value recovery, and at (e) for *plaintiffs* bringing proceedings against a trustee-defendant based upon a post-case commencement claim arising "from the operation of the business of the debtor").

[15]Changes were necessitated by those historic events which culminated in the pertinent 1984 bankruptcy-related amendments to Title 28.  *See, e.g., In re Greiner*, 45 B.R. 715 (Bankr. D.N.D. 1985).

14

apply to administrative matters, which are properly heard by the bankruptcy court"); *In re Nixon Mach. Co.*, 27 B.R. at 873 ("a paramount consideration [underlying home court bankruptcy proceeding venue] is speedy and economic administration of the bankruptcy case"), cited and quoted in *In re B & L Oil Co.*, 834 F.2d at 159 n.8.

Notwithstanding the prominent interest in bringing proceedings in the case-venued court, there must be due adherence to Congress' determination to except § 1409(d) qualifying matters from § 1409(a)'s home-court reach. "[T]he power of a debtor to reel persons from all over the globe into a single forum 'should be abrogated when the greater relative inconvenience shifts to the defendant.'" *In re Cont'l Air Lines, Inc.*, 61 B.R. at 771 (quoting *In re WWG Indus., Inc.*, 44 B.R. 287, 290 (N.D. Ga. 1984)). And, § 1409(d) reflects the view of Congress that the "greater relative inconvenience" shifts in circumstances satisfying that subsection. *Id*.

"At this point it is important to distinguish between those adversary proceedings which are 'administrative'[16] and those which are 'non-administrative' or truly civil litigation in the historic sense." *In re Cont'l Air Lines, Inc.*, 61 B.R at 770 n.25. *See In re B & L Oil Co.*, 834 F.2d at 160 n.9 (cataloging early cases where trustee activities were or were not deemed to be "carrying on the business" of the debtor). Indeed, *B & L Oil* is specifically instructive *sub judice*. That case centered on a trustee's complaint for a turnover of purported estate equipment which was seized postpetition by an insider of the debtor. Section 542 of the Bankruptcy Code was implicated. That action to recover property was found *by the bankruptcy court* not to be a matter which directly involved case administration. *This point was not raised as an issue nor*

---

[16]"[M]atters of an administrative character, includ[e] questions between the bankrupt and his creditors, which are presented in the ordinary course of the administration of the bankrupt's estate." *Taylor v. Voss*, 271 U.S. 176, 181 (1926).

15

*reviewed on appeal*.  834 F.2d at 158 n.6.  What was plainly reviewed and *rejected* was the

bankruptcy court's conclusion that the trustee's intent to use the equipment in the continued

operation of the debtor's business qualified the proceeding for (then) § 1473(d) venue.

> By its express terms, subsection (d) refers to claims *arising from* the
> operation of the debtor's business. Thus, that subsection applies to
> claims whose facts and legal bases originate from the business
> operations of the debtor. While it may, in some cases, be useful to
> consider the intended use of assets which are the subject of a claim,
> such intended use is not determinative of whether the claim regarding
> such assets arose from the operation of the debtor's business.

*Id*. at 159 (emphasis in original).

Plainly accepted by the Tenth Circuit and both courts below in *B & L Oil*, *id.*, is the

precept that "[m]erely collecting, taking steps to preserve, and/or holding assets, as well as other

aspects of administering and liquidating the estate, do not constitute 'carrying on business'[17] as

that term has been judicially interpreted."  *In re Campbell*, 13 B.R. 974, 976 (Bankr. D. Idaho

1981), *citing Austrian v. Williams*, 216 F.2d 278 (2d Cir. 1954), *cert. denied*, 348 U.S. 953

(1955).

The Bankruptcy Code includes parallel material relative to § 1409(d).  *See* 11 U.S.C.

§ 721, which provides as follows:

---

[17]Courts have deemed relevant to venue determinations interpretation of the parallel
material of 28 U.S.C. § 959(a); that section permits, as an exception to the general rule and in
certain circumstances, trustees to be sued without leave of the appointing court "with respect to
any of their acts or transactions in *carrying on business*. . . ."  In illustrating the "carrying on
business" exception of § 959(a), the Second Circuit cited "the common situation of a negligence
claim in a slip and fall case where a bankruptcy trustee . . . conducted a retail store."  *Lehal
Realty Assocs. v. Scheffel*, 101 F.3d 272, 276 (2d Cir. 1996), *quoted in Carter v. Rodgers*, 220
F.3d 1249, 1254 (11th Cir. 2000), *cert. denied*, 531 U.S. 1077 (2001).  *See also Haberern v.
Lehigh & New England Ry. Co.*, 554 F.2d 581, 585 (3d Cir. 1977); *Diners Club Inc. v. A.J.
Bumb*, 421 F.2d 396, 398 (9th Cir. 1970).  To the same effect under a predecessor statute, see
*Thompson v. Texas Mexican Ry. Co.*, 328 U.S. 134, 139 (1946).

> The court may authorize the trustee to *operate the business of the debtor* for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate.

(Emphasis added.)  Without this authority, Chapter 7 trustees are required to *liquidate* the assets of the debtor "expeditiously."  11 U.S.C. § 704(a)(1).  Thus, it is clear that the trustee's *liquidation* function is to be contrasted with and distinguished from the *operation* of business assets.[18]  Similarly, whether a receiver under historic statutory language "conducts the business" of the debtor, was determined by analysis of the receiver's functions in the case.   "[W]here the receiver carries on, at least substantially, the usual, customary, and normal activities of the bankrupt as a going concern," the conduct of business would be indicated.  *In re Duke*, 15 F.2d 92, 93 (E.D. Mo. 1924).  However, in that case it was determined that the receiver was *not* conducting business where, under the following circumstances, he was liquidating inventory.

> [The receiver] employed two of the bankrupts and a few other employees, who worked for a short time to finish certain caps in process of manufacture. This was necessary in order that the caps might be sold as finished caps, rather than pieces of cloth. No caps or other property of the bankrupt were sold by the receiver in the ordinary course of trade, but all the bankrupt's property was sold through an auctioneer at a public auction.

---

[18]For a discussion of the intersection of Bankruptcy Code § 721 and the 28 U.S.C.§ 959(b) obligation of a trustee to "manage and *operate* the property in his possession" (emphasis added) in accordance with state law, *see* 6 COLLIER ON BANKRUPTCY, ¶ 721.03[1] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.), where a clear distinction is made between "an operating trustee" and "a chapter 7 trustee that is simply liquidating assets of the estate."

*Id.  See also In re United States Prods. Corp.*, 57 F. Supp. 239, 241 (N.D. Cal. 1944) ("[T]o

conduct the business of the bankrupt . . . means that the trustee must substantially carry on the

day-by-day, normal activities, which the bankrupt, as a going concern, pursued").[19]

In the case at bar, it is plain and beyond controversy that the business operation of the

debtors before commencement of the cases was the collection of tires, the processing of those

tires so that materials would be recycled into various usable products, and the sale of those

products.  It is also clear that the Eloy facility was being readied, from and after the lease signing

in November 2008, to house that business operation.  And, it is likewise undisputed that the

actual functioning of the business of tire recycling was never undertaken in Eloy, either before or

after the filing of the bankruptcy petitions.[20]  *Before* the commencement of the cases, Sergi said

that he realized that he "would not be able to run a rubber recycling plant" at the Eloy facility.

Some of the mechanicals which had come from Arizona Rubber in December 2008 were

removed from Eloy in October and November 2009.  The remaining equipment was to be

readied for liquidation.[21]  In fact, sale of the Cracker Mill was being developed in late November

---

[19]These historic cases examined issues of compensation for the fiduciaries whose commissions would differ if they were deemed to be conducting the business of the debtor, as distinguished from merely closing out the business.  See as to *In re Duke* the then applicable Bankruptcy Act, §§ 2(5) and 48e; and, as to *In re United States Prods. Corp.*, the then applicable 11 U.S.C.A. § 76.

[20]It is not clear how close the Eloy facility was to "operational," nor who was to be the operating entity (a debtor or a nondebtor).  The important issue of affordable transmission of necessary water was said to have never been resolved; moreover, though the equipment was transported from the burned out Arizona Rubber facility in Maricopa, Arizona to Eloy and was owned by PermaLife or another debtor, the lessee in Eloy was "Eloy Rubber Recyclers."

[21]Sergi has certified that "[s]ince the Petition Date it has been my intention to liquidate the pieces of the Equipment which could not be utilized by one of the joint debtors."  Sergi Certif. ¶ 9.

2009.  *See, inter alia,* Sergi Certif. ¶¶ 4-9; Complaint ¶¶ 33, 40, 44.  Thus, here the claim of the

debtors-in-possession has significant bankruptcy administration underpinnings, and no indicia of

origin in the day-to-day business activities of the debtor *after* commencement of the case.[22]

Those administrative underpinnings include the following:

(i)     The seizing of what appears to be property of one or another of the debtors'

        estates, as either an unwitting or willful violation of the stay of 11

        U.S.C. § 362(a)(3);

(ii)    The inclusion of the stay provisions of § 362 as part of Chapter 3 of Title 11,

        denominated "Case Administration";

(iii)   This court's specific adjudication of issues pertaining to the equipment, having

        had on its docket the November 4, 2009 motion for stay relief of secured creditor

        KEFI, resolved by Stipulation and Order of December 21, 2009 (granting stay

        relief as to the CM Shredder and deferring as to the Cracker Mill);

(iv)    The active appearance and participation of KEFI in the case, as well as the

        formation and regular involvement of the committee of general unsecured

---

[22]This conclusion is, in this court's view, thoroughly supported by the significant
precedent discussed *supra*, applying § 1409(a) and (d), its predecessor, portions of § 1473, and
parallel material both in Title 28 (i.e., 28 U.S.C. 959(a) and (b)), and Title 11 (i.e., 11 U.S.C.
§ 721).  The movants cite as support for their position *In re Hillsborough Holdings Corp.*, 146
B.R. 1008 (Bankr. M.D. Fla. 1992).  That case is distinguished in *In re Eagle-Picher Indus., Inc.*,
162 B.R. at 143 on its facts as to parties, and as being "based primarily on forum non
conveniens."  Moreover, the *Hillsborough* discussion of § 1409(d) is sparse, centering solely on
the fact that events generating the relevant *tort* claim occurred postpetition.  To the extent that
the *Hillsborough* court assumed (without discussing) that there was a causative postpetition
business operation by the debtor, it is a different case than the matter before this court.

creditors, all indicative of the range of multiparty interests traditionally

centralized for consideration in the bankruptcy court where the case is venued;

(v)     The debtors' motion of December 23, 2009 to void the auction sale and for other

relief, bringing this court's attention to the first phase of the specific controversy

now before this court in this adversary proceeding;

(vi)    This court's hearing on the debtors' December 23 motion (January 4, 2010),

which included a bench order to maintain the *status quo* as to location and control

of the equipment sold at the auction;

(vii)   This court's Order of January 5, 2010, memorializing the effort to maintain the

*status quo*;

(viii)  The stated intention of the debtors' principal, Sergi, from and after

commencement of the cases, to *liquidate the equipment* (to the extent that it was

excess);

(ix)    Sergi's assertion that he had negotiated with KEFI for authority to sell the

Cracker Mill in a "short sale" and pursuant to § 363(b) of the Bankruptcy Code;

(x)     The startling disparities in initial equipment purchase price by the debtors'

interests (and the debt due KEFI, secured by that equipment as collateral), the

meager $5,000 auction sale price, and the resale prices, all of which could well

implicate bankruptcy considerations (whether they be Code-based or matters of

valuation and/or fraud affecting the debtors' estates and the administration of

estate assets); and

20

(xi)    The resale of the Cracker Mill to Bulldog, a party who is said to have been
bargaining to purchase (indirectly) from a debtor, purportedly knowing of that
debtor's status and ownership, at a price higher than the eventual resale price
(again, potentially implicating other bankruptcy considerations impacting on case
administration).

Consistent with the above list suggesting the administrative character of this adversary
proceeding are the following *contraindicators* contesting that the debtors' claim arose after
commencement of the cases "from the operation of the business" of any of the debtors:

(i)    No debtor (nor the nondebtor lessee "Eloy Rubber") performed at the Eloy
facility (or elsewhere in Arizona) any of the actual processing functions
attributable to the recycling of rubber tires *after commencement of the case*;

(ii)    No debtor (nor the nondebtor lessee "Eloy Rubber") performed at the Eloy
facility any of the actual processing functions attributable to the recycling of
rubber tires even *before commencement of the case*;

(iii)    The Eloy facility never became fully operational so as to permit the day-to-day
rubber recycling functions which were the essence of debtors' business; and

(iv)    Debtors' principal, Sergi, *prepetition* intended to restart the business of rubber
recycling at Eloy; however, he both realized *before the cases commenced* that he
would not be able to operate there *and* intended to liquidate the excess equipment
located at Eloy.

This court concludes, on the record before it, that the debtors' claims are central to
bankruptcy administration and do not arise from the postpetition operation of the business of any

of the debtors.  Section 1409(a) venue applies; § 1409(d) venue does not apply.  Prepetition

execution of the Eloy lease with intent to restart rubber recycling there, whether to be undertaken

by a debtor or Eloy Rubber as a nondebtor, does not bring this adversary proceeding within the

purview of § 1409(d).  The partial readying of the facility prior to the commencement of the

cases is likewise unavailing to the movants.  Rather, administrative considerations of the

bankruptcy cases are overwhelmingly present.  Defendants, having to shoulder the burden of

proof in disputing venue in this circuit, cannot do so; nor, in this court's view, could they have

succeeded in their motion to characterize this proceeding as a § 1409(d) qualifier in a circuit

which sees that burden differently.

IX.    MOVANTS' REQUEST FOR A CHANGE OF VENUE
        PURSUANT TO 28 U.S.C. § 1412.

"[I]n the interest of justice or for the convenience of the parties" § 1412 gives this

bankruptcy court certain discretion to transfer a proceeding properly before it.  Nevertheless,

there is a "strong presumption in favor of maintaining venue where the bankruptcy case is

pending."  *In re Hechinger Inv. Co. of Del., Inc.*, 288 B.R. 398, 402 (Bankr. D. Del. 2003)

(citation omitted), quoted with approval in *In re Onco Invest. Co.*, 320 B.R. 577, 579 (Bankr. D.

Del. 2005).  *In re Hechinger Inv. Co.* makes the further bankruptcy-related points that "the

plaintiff's choice of forum should rarely be disturbed," that "[t]he burden of proof is on the party

requesting the transfer," and that the "burden must be carried by a preponderance of the

evidence."  288 B.R. at 402 (citations omitted).  *Compare Jumara v. State Farm Ins. Co.*, 55

F.3d 873, 877-83 (3d Cir. 1995) (deciding venue issues arising under the general civil action

transfer provision of 28 U.S.C. § 1404(a)).

Section 1412 bankruptcy venue transfer determinations are said to turn on the same

factors which would apply to questions of *civil action* transfers under § 1404(a). *See In re*

*Hechinger Inv. Co. of Del., Inc.*, 296 B.R. at 325, *citing In re Centennial Coal, Inc.*, 282 B.R.

140, 144 (Bankr. D. Del. 2002). And, *Jumara* sets forth a *nonexclusive* compendium of factors

which are in addition to those embodied in § 1404(a) (i.e., "[f]or the convenience of the parties

and the witnesses [or] in the interest of justice"). *See* 55 F.3d at 879-80. *Jumara's* additional

factors are concisely listed in *In re Hechinger Inv. Co.* as follows:

> (1) plaintiff's choice of forum; (2) defendant's forum preference; (3)
> whether claim arose elsewhere; (4) location of books and records; (5)
> convenience of parties, as indicated by their relative physical and
> financial condition; (6) convenience of witnesses, but only to extent
> that witnesses may actually be unavailable for trial in one of the fora;
> (7) enforceability of judgment; (8) practical considerations that would
> make the trial easy, expeditious or inexpensive; (9) relative
> administrative difficulty in each forum; (10) public policies of the
> fora; (11) familiarity of judge with applicable state law; and (12)
> local interest in deciding local controversies at home.

296 B.R. at 325-26. However, there can be no rigid formularizing of discretionary venue

transfer determinations; nor should the bankruptcy context of an adversary proceeding

undertaken within a bankruptcy case be diluted or neutralized by overemphasizing the more

general catalog of broad civil action transfer considerations. *See In the Matter of*

*Commonwealth Oil Refining Co., Inc.,* 596 F.2d 1239, 1247 (5th Cir. 1979) (affirming as to a

Chapter XI *case* venue transfer motion the bankruptcy court's denial of transfer and its

conclusion "that *the most important consideration* is whether the requested transfer would

promote *the economic and efficient administration of the estate*") (emphasis added). In

considering *adversary proceeding* venue transfers under § 1412, some courts have incorporated

the efficient administration consideration into the statute's "interest of justice" element. *See,*

23

*e.g., In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1390 (2d Cir. 1990), offering the

following guidance:

> The "interest of justice" component of § 1412 is a broad and flexible
> standard which must be applied on a case-by-case basis. It
> contemplates a consideration of whether transferring venue would
> promote the efficient administration of the bankruptcy estate, judicial
> economy, timeliness, and fairness. . . .

*Sub judice*, this court has already addressed a number of administrative considerations

which support the venuing of this proceeding, per § 1409(a), in this court. The § 1412 based

motion[23] is grounded solely in the two following paragraphs from the Williams Declaration:

> 14.    Litigation in the District of New Jersey will be burdensome,
> expensive, and inconvenient for TSJ, Mr. Morrison and me due to the
> facts that New Jersey is located more than 2,000 miles from Arizona,
> we do not reside or conduct business in New Jersey and we will be
> required to travel to New Jersey to prepare for and attend proceedings
> and retain and pay attorneys in New Jersey at a cost we anticipate to
> be much greater than a defense in Arizona.
>
> 15.    All of the defendants, witnesses and exhibits relating to the acts
> alleged in the Complaint are located in Arizona, with the exception
> of employees of another defendant, Bulldog Marketing, LLC, who
> are located in California.

Fletcher, L&C and their client TSJ, along with its principals, Morrison and Williams, are

located in Arizona, as is defendant Ma; however, defendants Bulldog and presumably its

president Willis are in California and, *contrary to ¶ 15 above, defendant IDM is in Ohio. See

Complaint ¶¶ 11-13.  Nevertheless, it is clear that Arizona would be a more convenient venue for

---

[23]Only defendants Fletcher and L&C have so moved, relying apparently on the Williams
Declaration; yet § 1412 is neither cited nor can the court find any effort to address *forum non
conveniens* precedent in the brief of these parties.  There are a few references to Eloy Rubber's
presence in Arizona and the lack of this court's jurisdiction over that entity, *see* dkt. No. 11 at 2,
"that the parties . . . are primarily located in . . . Arizona," and that not only bankruptcy law but
also Arizona law applies.  *Id*. at 3.

most of the defendants.  However, as to the movant's claim that "all . . . witnesses" are located

in Arizona, no such witnesses, other than perhaps the individual movants and Ma, are identified.

Movants give no consideration to the other side of the litigation equation, including a

range of other non-Arizona witnesses and interested case constituencies.  Sergi, as the principal

of the debtors and at the center of the proceeding, is in New Jersey.  KEFI, already having made

an appearance in this court, is actively involved in the case and a logical source of documents

and witnesses.  KEFI is located in *Albany, New York*.  *See* main case dkt. 185 (Ex. A at 1).

The manufacturer of the Cracker Mill, Break Rubber Technologies, LLC ("Break

Rubber"), is said to have had its employees deal with defendant Bulldog and with Morrison at

relevant times.  Break Rubber is located in *North Liberty, Indiana*.  *See* submission in main case

following January 4, 2010 hearing at dkt. 253 (Futa Certif. Ex. A).  Its managing member David

Futa and employees Rick Davis and Andy Ujak are presumed to reside at or near that Indiana

place of business.  Their certifications were submitted as follow up to the January 4 hearing.  *See*

main case dkt. 253.  Rick Davis, who inspected the Cracker Mill in the presence of other

defendants, is a potential witness. Andy Ujak had what appears to be a pertinent conversation

with defendant Morrison on December 3, 2009.  *See* Complaint ¶¶ 46-49.

Morrison has thus overstated his case for a change of venue; New Jersey is an

inconvenient venue for him and his colleagues, but it is by no means universally inconvenient.  It

25

appears to be relatively convenient for a number of witnesses[24] (as well as other case

parties-in-interest).  Morever, it is certainly convenient for the hard-pressed Chapter 11 debtors.

In fact, these Chapter 11 cases are foundering; they might not survive to the point of

reorganization, raising the specter of possible conversions and the appointment of a Chapter 7

trustee.  That, of course, is another potential New Jersey constituency.  Adding to the cost of

litigation in this proceeding by transferring it to Arizona would be decidedly negative for these

debtors' reorganization prospects (or even for structured liquidations).  Embedded in this

consideration is the fact that Sergi remains at the helm of the debtors and would be unduly

pressured by having to participate in an Arizona litigation.

Besides distance/travel-related issues, this court is compelled to note that it has been

involved in this dispute since late December 2009.  That familiarity should help in expediting

trial or other resolution.

Movants cite Arizona landlord lien law as having applicability here.  Presumably, their

point is that an Arizona court would be better positioned to apply that law.  As a general matter,

this court has no quarrel with that proposition.  However, as with other aspects of the motion, no

specifics are offered as to complexity of the law, problems with interpretation or application, or

even precisely where it is implicated in addressing the stay violation claims of the Complaint.

No special public policy of Arizona or familiarity of an Arizona judicial officer with the current

dispute is cited, nor is there any assertion of a local interest or a characterization of this dispute

---

[24]Strictly speaking, mere convenience of witnesses should not be a direct factor in determining the appropriate forum (provided actual trial availability is not at risk).  However the ease of availability of witnesses for discovery as well as trial inevitably affects litigation efficiencies and cost.

as a "local controversy."  Similarly, this court can enforce its judgment if one should eventuate, not unlike a bankruptcy court in another venue.

Overall, this court is not inclined to change the venue of this proceeding from that which is proper under § 1409(a).  The interests of justice require deference to the substantiality of the bankruptcy administration factors set forth in Part VIII, *supra*, and the persisting specific points of connection to the Chapter 11 cases and this court cited therein.  Moreover, various bankruptcy constituencies (e.g., the secured creditor, KEFI, and the general unsecured creditors represented by the committee) have a stake in observing and evaluating the proceedings.  This court's familiarity with the dispute and the necessary venuing of its preliminaries here weigh in favor of the New Jersey venue.  So does the New Jersey location of the main operating officer of  the debtors, Sergi, and the need for limiting the litigation costs for these hard-pressed debtors.

This court is mindful of the inconvenience of the New Jersey venue for the Arizona-based litigants, and will make all reasonable efforts to ease their burden in litigating at a distance.  However, their inconvenience is substantially outweighed by the inconvenience to others and the overall interests of justice.  The movants have thus failed to carry their burden in seeking a § 1412 venue change; their motion must be denied.

X.    <u>CONCLUSION</u>.

For the reasons set forth throughout this Opinion, the motions to dismiss this proceeding based upon improper venue and to transfer venue, are denied.  The court is issuing an order implementing its decision.


Dated:  July 8, 2010                             /s/Moris Stern                  
                                                          MORRIS STERN
                                                          United States Bankruptcy Judge